State agencies, like the San Jacinto River Authority, are immune from suit under the Sherman Act when any anti-competitive effects of their actions are the foreseeable result of the statutory power delegated to them by the state. The district court erred in applying the two-part Mid-Cal test, and the court order should be reversed for three reasons. First, the district court framed the legal test too restrictively. Step one of the Mid-Cal test only requires that any anti-competitive effect is the foreseeable or the inherent, logical, or ordinary result of the exercise of authority delegated by the state. Second, the district court misconceptualized SJRA as a mere market participant, but the text of SJRA's enabling legislation expressly allows it to control and regulate surface water, including entering into contracts that allow it to collect rates to fund surface water infrastructure. And third, the district court did not discuss the second part of the Mid-Cal test at all, yet the fact that the second part of the test does not apply actually informs how to apply the first part of the test, and it further confirms that SJRA is acting pursuant to state policies and not to further private interests. So turning first to the legal test, as the court, the U.S. Supreme Court held in dental examiners, the ultimate question here is whether an anti-competitive policy is indeed the policy of the state. We now have 40 years of case law applying the Mid-Cal test and interpreting it, and what we can see from that 40 years of cases is that the first prong of Mid-Cal that's nicknamed the clear articulation prong is really kind of a misnomer, that in light of the full body of case law, it is not a magic word. Watered down. So you agree there isn't a clear articulation in the statute itself. Well, it's certainly not what my ears would think of when I hear clear articulation. It's not magic words. It is not some kind of express statement test. It's actually far more practical and holistic, where courts look to state policy and they look to the text of the statute, but they are looking for some evidence that the acts that are being complained of are the, any anti-competitive effects of the acts being complained of, are the foreseeable result or the logical, ordinary, inherent result of the power that's been granted by the state. And the Halley case is actually, I think, very, very helpful for trying to decide how clear must clear be. It's specifically answering the question, how clearly must a state policy be articulated in the statutes? And there the U.S. Supreme Court frames the issue as whether the activities are authorized but not compelled by the state, and said it's unrealistic to expect state legislatures to spell out every possible anti-competitive effect or to expressly state everything that's anticipated in a statute. So instead, it's sufficient where the state legislatures grant broad grants of authority. And this court's decision just last year in specs, I think, is a perfect example of that, and it's applying this test in the context of a Texas state agency. And the specs decision, which actually came out just a week and a half after the district court opinion in this case, is the perfect template for this court in applying this test. I think the U.S. Supreme Court's decision in Halley, which really focuses on how clear must the statute be, and this court's decision in specs, in conjunction with each other, are really helpful cases for framing this legal test. We've cited in our brief a number of water cases where you can see that courts holding that water authorities and municipalities enjoy state action immunity by virtue of broad authority to supply water and set rates. And some of the common denominators of those cases are that courts are looking to the kinds of authority like the power of admin domain, the power to set water rates. Those types of powers indicate that the state has given regulation, has had an intent of displacing competition with regulation and giving these water authorities broad powers. And that's where state action immunity is being upheld. That's the bottom line. Is it reasonably foreseeable that SJRA was designed to displace sort of the free world of competition with a regulated one? Yes. That's right. So turning to the application here, taking this legal test and looking now to Texas state policy and SJRA's enabling legislation, the district court, I think, erred in misconceptualizing SJRA as if it were just a mere market participant with broad contracting authority. And if you look to... Especially as to surface water, but crediting their allegation, the groundwater, the aquifer is huge and there's no need to displace competition in the groundwater. That's their allegation, at least, because it'll last for millennia. So SJRA might want to build its plants and do surface water regulation, but why does that necessarily allow for displacement of utilities like theirs that are primarily drawing from the groundwater? Right. Well, and that's why we've actually taken pains in our brief to give a little bit of a picture here. Yeah. A different picture, but it has to be the compelling one to win at this stage. Correct? Well, I think to understand Texas policy, you want to understand the whole picture, not just an advocate's perspective. Yeah. And so, you know, starting with the state constitution in Texas, you can see that it is the policy of the state. Conservation and development of water is a public right governed by the legislature. And then at the very beginning of the water code, it says it is the public policy of the state to provide for the conservation and development of the state's natural resources. So we've taken pains in our brief to explain that when you're talking about water, there's basically two options. It's groundwater or surface water. And so SJRA only has regulatory power and control over surface water, and it's the Lone Star Groundwater Conservation District that has that power and control over groundwater. But when Lone Star regulates groundwater, that will necessarily impact SJRA. This is the huge wrinkle here is that Lone Star's regulatory authority has been invalidated. Correct? That, well, I would say it slightly differently. The rule that Lone Star enacted has now been held by a Texas state court to be void. So I thought the appeal was dismissed. That's correct. So there is a Texas state court, trial court judgment saying that Lone Star's rule is void. Now, that happened many years after the rule was enacted and after these contracts were entered into. So... True, but the contracts were entered into. Go ahead. But the rule is void because it's, I mean, there's no, the Texas Supreme Court doesn't take it up. Why isn't the rule void? Oh, no, it is. The rule is void. We're not disputing that. So the ground, the Lone Star rule is void. These contracts are not Lone Star ground rule. So these are a totally separate issue. What, could you, I know that you talk about these things in your brief, but can you please tell us a little bit about how SJRA is a market participant, though? How is it a market participant? Well, SJRA does provide water. So it has its own, it is a large volume groundwater user, just like the Appalachians in this case. It has wells that it provides, but it, I think its primary function is controlling the surface water in Montgomery County. But it also contracts to distribute and that sort of thing. It makes agreements with other users, right? That's correct. And different users. And so one thing to understand is that entities like the Appalachians are private investor owned utilities. They contract with like developers of subdivisions. Right. They get a certificate of convenience and necessity. They get a little monopoly power over a small area to serve residential customers. SJRA doesn't do that at all. SJRA controls the surface water in the area and it may sell surface water to industrial uses like ExxonMobil or to municipal utility districts, MUDs, but it's not, they're not competing because they have different. But isn't SJRA's contract now going to charge a fee based on their removal of groundwater? Yes. Yes. But where do they get regulatory authority to do that? Because that's what their argument is, that's what they're displacing. Right. So the best... But that traces us back to Lone Star, doesn't it? That's where you were going. Well, the most precise answer to your question is in SJRA's enabling legislation. It's in the record excerpts at tab four. Section three lists a very long laundry list of very specific powers that SJRA has. And the precise one for this question is XVIII, which gives it the authority to enter into such contracts for the purpose of establishing and collecting rates and other charges for the sale or use of water, water transmission, treatment or connection facilities, and any other services sold, furnished or supplied by the authority. So this is giving SJRA the authority to enter into contracts to charge rates that fund the surface water infrastructure. So recall that even though what they're complaining about is the fact that, well, they just pump groundwater, they don't use surface water, they are collectively participating with other users that do use surface water to pay for the cost of the surface water infrastructure. And so part of what they're being charged is a rate on their groundwater pumpage that goes to fund the cost of this infrastructure. It really is going to fund the debt service on the bonds that were issued to pay for the half a billion dollars of surface water infrastructure that was required to conserve groundwater and develop surface water in this rapidly urbanizing area. I guess what I'm saying is complicated and you both know this well. But it seems like they enter in as a participant on the surface water regime. But now through the contract, they're actually going to elevate the price of groundwater  The cost. The cost. Ultimately, then the price passed on to consumers. And that's what I think their allegation is has become a restraint of trade. And I think the history, even in your brief, as to why that's allowable does turn on Lone Star's regulation, the groundwater removal rule, correct, sort of? Correct. I think the reason that we have this groundwater reduction plan is because Lone Star required it. Yes. So all the large volume groundwater users, including SJRA, had to come up with a plan and figure out a way that either individually or collectively to reduce their groundwater usage. And the most efficient, economically practical solution was to band together and to fund the surface water infrastructure so that some users could just take surface water and some could keep pumping groundwater, but collectively they comply. That's the concept. And this, it's not a novel concept. This is the same thing that's being done in Harris County and other major urban areas where you have to fund surface water infrastructure in order to change your usage. They're saying that you created that arrangement with Lone Star, with the Memorandum of Understanding. They had to sign these contracts because the $10,000 a day penalty was too much. And now the contracts are going to force them to raise their prices. That's sort of the essence of it, correct? That's what they're... Let me put a fine clarification on that. Yes. They had options. They could have just reduced their groundwater usage by 30%. That was option one. They had other GRP, groundwater reduction plans, with other entities that they could have gone with. They chose SJRAs and, you know, as a practical matter, if they wanted to keep servicing all of their customers, they needed some kind of plan like this, but they didn't have to participate with anybody else. They could have been... Just because I've consumed a lot of your time, what's your closest case that this is a foreseeable result? This meets the clear articulation test? I think the Kern-Tolari case, if I'm saying that correctly. It's a Ninth Circuit case from 1987. It's, you know, like Hallie, it's looking to this broad authority where the city had authority to contract for, acquire, hold water rights, and looking to broad authorities by a state agency is sufficient because, remember, at the end of the day, this is about federalism. This is about courts not wanting to apply the Sherman Act to the states, and when you have confidence that the actions are those delegated by the state, you don't want to apply that to entities that are complying with state statutes. So I think... If they're supervising and if they're not in the business themselves, you know, there are a lot of ifs there. Yes, and I see my time's about to expire. Let me try to address that. So can you please talk about the appraisal case and the dentist case and why? It's a very important part of this, and Dental Examiners is actually very helpful because, well, it's a 6-3 decision. It shows nine justices all agreeing that the type of entity at issue matters, and when it's a state agency that is not governed by active market participants, like SJRA, not only do you not have to satisfy that second part of the test, the supervision part, but it also is reaffirming the HALLE standard of broad grants of authority being sufficient. Because you want to be deferential to state agencies, you don't demand as much clarity in the statutes. But my time's expired. SJRA is a supervised entity, and I'd be happy to get into that on rebuttal, but that actually should give the Court even more confidence. Thank you. May it please the Court. SJRA always knew it didn't have permission or authority for the GRP contracts. Exhibit 25 to the complaint is SJRA and Loan Stars 2006 Study and Implementation, and on page 2260 of the record it notes that participants identified several powers and areas of authority that SJRA currently lacks. Most notably, the SJRA does not presently have any authority to regulate the production of groundwater, including the power to assess fees based on the volume of the groundwater production. So what's the solution? They tell us on the very next page. It does have that authority for surface water? It does have that authority. That's a critical distinction? Right. But Hershey was reading from subsection 18, suggesting it's as to use of water generally. Right. If what we were talking about here was a system that dealt with the runoff water and the storm water of the San Jacinto River Authority and how you use that water, they would be absolutely correct and we wouldn't be here. The thing that she's leaving out is under Texas law, groundwater belongs to the landowner, and this is about their regulation of groundwater, not surface water. Right. Not runoff water. This is beyond their authority. And they knew that. On the very next page, what they say is the SJRA and Loan Star are legislatively created and a mandatory legislation of the Enabling Act to each would be the appropriate and lawful method to modify their powers to serve individually and cooperatively. That would make it unmistakable, but the law is clear. It doesn't have to be explicit. The misnomer point is a good one. We're looking at reasonable foreseeability. Right. But it's not even close, Your Honor. If you look at, and Harris County is a great example. Now, they brought up Harris County, and they were asking for explicit, Your Honor, just to be clear. They did ask for explicit. They did ask for explicit, and that was their purpose. They asked for powers that would give them, and this is in. But that's a lot of tea-leave reading. I mean, one could, I mean, you all know your case much better in this area, but it is also interesting that last year the Texas Supreme Court described these as incontestable, so that. I'm sorry. No, no, you tell me. That's just in the idea of the authority, right, to, it was just a review of whether or not the actual execution was done correctly. It's not a review of the merits. I would say that that is, in what we talked about in, Supreme Court talked about in North Carolina Dental, that is the process that allowed it to occur. It's not a review of the actual merits of their authority. That's never happened until now. And she brought up Harris County, they brought up in their reply, and I'm glad they did, and I want to make sure to get this in for the court. If you want to look at the comparisons of those two statutory schemes, the statutory authority for SJR, which is about surface water and runoff water, versus, and I've got to give you this site because it's hard to find, it's called the Special District Local Laws Code, Chapter 8888. Again, that's the Special District Local Laws Code, Chapter 8888. And that creates the North Harris County Regional Water Authority. And that's what they wanted to be. They wanted to be like Harris County. So look at that statute, and you'll see all the enumerated powers it gives. But there's two in particular I want to point out, 8888.001 defines water as both surface water and groundwater. It clearly gives them authority over all of that water. And then look at 8888.157A. Quote, the authority may develop, implement, participate in, and enforce a groundwater reduction plan. The groundwater reduction plan is binding on persons and wells in the authority, period. That's the authority they wanted. If you go back to Exhibit 15 of the complaint, page 1868, that's exactly what they asked the legislature for. They said, SGR proposes an amendment to its enabling legislation that will provide it with the powers needed to adopt, implement, and enforce the countywide groundwater reduction plan. And they didn't get it. Now, why didn't they get it? Well, they tell us that, too. In Exhibit 16, page 1936 of the record, they talk about the problem, and they say the problem  So the point is, SJRA wanted to be able to regulate all water in the county just like Harris County. They went to the legislature and said, let us do that. And the legislature did not pass that act. So what did SJRA do? They did it anyway. They just moved ahead and coerced through using Lone Star and the Lone Star rule as a tool. They coerced the majority of independently owned utilities into these GRP contracts that unlawfully fixed the price of water in Montgomery County. Now, the legislature, I think if you look at 888, Your Honor, tells you, we know how to do this if we want to. We didn't do it in this case. Are you agreeing that they had the authority to enter into these contracts, but just not contracts that lead to monopolization? Well, I don't know how to separate that out, Your Honor, but no. I think that the problem is, what the problem is, these contracts do tell you. In other words, to answer this question about state immunity, do we have to get into the merits? Well, and that's an interesting point that I wanted to bring up, because I recognize both yourself and Judge Elrod were on the Louisiana real estate appraisals decision last year that Judge Jones wrote the opinion on. And that one you talked about, and it's a very different case, it's an FTC case. But you talked about the idea that we're not really going to get into the merits, that if the actual determination of immunity is tied directly to the merits question, then you say it's not proper for a collateral order doctrine case. So recognizing that, what I would say is that they can't enter into these contracts because the contracts do two things, right? As the district court recognized, they create a vertical price fixing, which is they don't have control over us, right? They weren't supposed to have control over our water. And in the system set up by Texas, we have competition in the water market with individuals being able to compete, both private and public, surface water and ground water in Montgomery County. But what they did is force us to put these fees in that artificially raise the price of our water to match what a surface water provider would be doing. And it's not even, I don't even think this is a, it's not a. It's sort of a merits question whether there was force in your signing a contract. Right. And there may be. The force seems to come more from Lone Star. Well, Lone Star is a combination, and there will be a merits determination, and that's fine. But since you brought up real estate appraisers, if your position is that they are subject to part two of MIDCALL, why are you acknowledging that we have jurisdiction over this interlocutory appeal? Right? Because they're not controlled by private actors. Well, Your Honor, our argument about the second, and I don't actually think you should get to the second issue. But your position in the brief is that they are, they have to. So if your contention is that even a state entity not controlled by private actors are private subject to part two, how could we have jurisdiction after real estate appraisers? I didn't read real estate appraisers that way, Your Honor. My understanding was that the part of, and real estate appraisers has two issues. One is there wasn't a final determination in that case. But the second reason was, and it's near the end of the opinion, they talk about the idea that because it asks you to address the merits, that's beyond the collateral order. And I just took that to mean the merits of whether or not it would be, you know, whether or not it would be a violation of the Sherman Act, as opposed to whether or not there's immunity. Now, the second issue on immunity on North Carolina, what I would say is, I don't, I think it's, I think the first issue is clear. I don't think there's any problem, and I don't know that we were ever going to find a clear case for the Sherman Act for the first issue. The second issue about whether or not you would need to reach it, it's really a difference between when we talk about what the requirement is for active supervision and what the Supreme Court said in . . . When we're talking first and second issue, you're talking about the clear articulation versus . . . Yes. When you say it's so clear, discuss for a minute the Ninth Circuit case that she says is the closest, because reasonable foreseeability is a pretty encompassing concept, and . . . Right. Your Honor, so I think if you look at Summit Water, which is the Utah Supreme Court applying federal law, and also I think the Kay Electric case from the Tenth Circuit, which is then Judge, now Justice Gorsuch's opinion, those are the clear cases, and essentially what those cases talk about is the idea that you have a utility does not . . . I mean, essentially what they're arguing for, Judge Higginson, is the idea that because it's a public resource, it must mean that there's some inherent or broader authority for them to do what they want to do. That's completely contrary to the system that Texas has created, right? In Texas, groundwater belongs to the owner of the land, and they recognize that if you try to take that, and this Court's recognized, that would be a takings claim, right? And the question is, how can they come in and regulate it? Now, the legislature, if it wanted to, could create that system. They showed it to us in Harris County, but that's not the system that we have in Montgomery County, right? That's a deliberate choice by the legislative body, and it has to be respected. And I would point out, Your Honor, this opinion came out in August. We just wrapped up a legislative session. I didn't see a Rule 28J letter telling us the legislation has been passed to fix some error, because it's not an error, right? Texas deliberately allows competition. Now, you can argue with that as a policy choice, but that's not what we're supposed to do here, right? The question is— But you began by saying it is fairly inferrable that they can restrict competition as to surface water. Right. If this was a question about the San Jacinto River Authority's ability to control the runoff and tributary water, the surface water of the San Jacinto River Authority, there would be no debate, right? That's what they were given control over, and that's what their statute talks about, right? Their authority says over and over again it has to do with runoff water and surface water. Nowhere in there did anyone ever contemplate they would be creating a cartel that would equalize the price of water in Montgomery County, but that's what they did, right? There's two things that these things do. The first is the vertical price fixing that I was talking about. I'm sorry, Your Honor. No, no, no. No question. The first is the vertical price fixing because they are, as she says, a wholesaler. They're also a competitor of us, right? I think in the briefing what their real argument is they don't think they're our competitor because they have better clients, right? But the point is they're a retailer too. They also sell water to our other competitors like MUDS, right, that turn around and sell in neighborhoods. So we're directly competing, right? But they know surface water costs way more to produce, right? And that's the whole point of this creation of the system. I mean, when I started to say earlier, Your Honor, I don't think you're going to find a better case documented of price fixing. I mean... We're not trying to reach the merits. Right. But I mean... I did ask you to distinguish the Ninth Circuit. You instead cited your strongest case. No, I'm sorry, Your Honor. That's probably... I need more coffee. The current case really is about the idea and that's... It's important to look at each one of these cases. The current case is where the city has given... The city has the right to have water rights. And someone came along and said, we want to sell some of your water away. And they said, no. And what the court said was, look, inherent in the idea that you gave them these water rights, they have the right to refuse to give it up, right? And then if you look at... I mean, I think a better example to understand what they're arguing is look at the Otten case out of Florida. It's one of the cases they cite. And in that case, what they said is it was a municipality that was given authority over to control the municipal water supply. And what they did was they passed a regulation saying you can't build your own wells. And they came in and said that was a violation of the Sherman Act. And they said, no, because it's clear that this is a monopoly given to the municipality over water in the municipality. In Austin, right, if you sign up for a house, if you buy a house, you have to buy Austin water, right? The legislature has the ability to create that monopoly, right? But they didn't do it in Montgomery County. If they had done it in Montgomery County, I think the first question to ask is, why are there over 200 different competing utilities, water utilities, right? They brag in their brief that they had over 140 of them that they forced into these contracts. Well, the fact that there's over 140 competing utilities should tell you this is not like Otten. This is not like the Mobile case they rely on where it is, you know, they're given control over sewer and water, right, specifically by legislative control. I mean, what they have is a very old statute, and when she talks about trying to deal with the natural resources, that's all fine and good. But what they weren't trying to do is allow the utility, it's not foreseeable, to allow the facility to fix prices. And so what they really did here, besides just the vertical price fixing, is they did horizontal price fixing. Because what they do is they come in and they know, and this is what I was going to say a minute ago. They say the goal of the entire project, that same Exhibit 25 that I cited earlier, right, the secondary cost, right, was to in fact move toward a quote-unquote price neutral cost of water. A price neutral concept would allow the retail suppliers to use water, either brown water or surface water, for the same cost. Again, in a memo, this is Exhibit 19, page 21-23, final plan equals something that equalizes the cost throughout the county. That's not anywhere in their mandate, right? The idea of the Texas system, right, rightly or wrongly, you can criticize Texas if you want based on what happened during the winter storm about electricity, but Texas made a And they've had every opportunity to go to the legislature and change that. And they haven't done it. Why? Because that's not the system Texas has adopted. So is the way, I mean this is fascinating, but is the way that this is able to work, because I mean normally you would be really suspicious, and I know we're not on the merits, but of stating a price fixing claim with this many participants and this, I mean just the whole idea of it, is because it's just really out in the open, because they're saying they can do it, and in fact they're supposed to do it. Is that why it works when it normally, you would never hear of 140 participant price fixing, you know. It works because they, I'm sorry. No, I'm just. It works because they forced us to, which is why I was saying earlier, you're never going to find an easier case to prove, because they've admitted it, right? That's their point, right?  So. I don't even think that's true. I think that's correct, Your Honor, because if you look back at the exhibits I was talking about originally. Well, they're arguing that they're entitled to do it. I think they're arguing that they should do it. That it's necessary, right? What I can't see is anywhere, I mean, when she talks about that section 18, and it uses the word water, right? There's no reasonable reading of their construction or their statute that would come up with the       Right. Right. Right. Right. Right. Right. Right. Right. Right. Right. Right. Right. Right.   Water sources. You can equalize the prices between two different water sources. Right. There's. But I do need to ask you a question that's kind of more to their argument. So.  What distinguishes Mid-Cal Prong One. I'm sorry, Your Honor. What distinguishes the Mid-Cal Prong One analysis, in this case, from the Halley? That is a stumbling block a little bit. I'm sorry, the Halley? The Halley case. Oh. You know, the Halley case, you know, the ability to add to, alter and repair sewage systems foreseeably results in instituted competitive effects. Then it seems that it's an explicit grant to coordinate and contract with private and public entities. I mean, that's that's the Halley type approach. And Halley's been relied on a great deal. So. I appreciate that, Your Honor. I'm blanking right now on the facts of Halley. And I apologize. OK. That's OK. Thank you. But. When you just a moment ago, you said that you were forced into it by them, where I thought there were dozens of similar utilities that didn't sign. Well, there were some utilities that because of where they were, like geographically where their well is, do they have to join, you know, or could they join some other sources? But the reality was that they're faced with this Lone Star rule, right, that creates a $10,000. Which has been invalidated. It's been invalidated. But at the time, it hadn't been. And they were faced with this idea that we're going to start incurring a $10,000 a day rule or we have to sign this agreement. And they challenged the $10,000 a day rule and the 30 percent reduction, which has been thrown out. And the question is, they still want to enforce the contracts, even though there's no real service provided. I mean, at this point, the only thing the services the only things being provided, quote unquote, are fees. It's just being used to equalize the price of water across different, you know, across different entities. So the fees are what's paid, I guess the plant's largely built? Yeah, it's built. It's operational, I understand. So if you concede they had the authority to regulate surface water, but the only way to regulate surface water is to create the plant. That's not foreseeable. It's not foreseeable that they would have to get buy-in from everyone? No, Your Honor. I mean, if that's the expanse of reading, right, then they could regulate gas, they could regulate electric, they could regulate anything under the idea that we need money. But they're enabling statutes specific to water users. Well, but it's not, it's just surface water, Your Honor. It's not to ground water. So your argument turns on there being a distinction between us not accepting that the relevant market is the wholesale raw water, period. Right. They have exactly this authority to impose fines and fees as to surface water. But isn't that pretty darn illogical that you just can't do it without realizing that others will undercut any effort you have to regulate surface water from a ground water that's much cheaper? Well, I think you have to recognize that that legislation was passed a long time ago. I know. Before this was envisioned. And the idea is they want to say that because they have authority over surface water. Which you agree with. Which we agree with. They have authority to regulate all water. And that's clearly contrary to every one of these cases that talks about how you should judge the scope of their authority. And Chapter 36 recognizes we can participate, too, in the market. And if we're allowed to participate in the market, then they're subject to the Sherman Act. Thank you. Thank you.         Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. May it please the court. Judge Higginson, you asked, do you agree that SJRA had authority to enter into these contracts? I didn't hear an answer to your question. But I can tell you that these entities have conceded in state court litigation that, yes, SJRA had authority to enter into these contracts. When the lead argument in a statutory interpretation case is legislative inaction, that should give the court some pause. That's what I heard them start off with today, is the idea that, oh, our enabling legislation wasn't clear enough, so we needed to go to the legislature to get authority. And that's not any sound way to read the enabling legislation. Instead, you look at the text that we have, and when counsel was specifically asked about subsection 18, he had no answer. And if their contention is, well, we didn't have express authority to build surface water infrastructure, I think that's clear in 18, but there's several other provisions that address that, too. And I'd point the court to subsection 3, little 5, V, gave us authority to provide water for myriad purposes, and in connection therewith, to construct or otherwise acquire water transportation, treatment and distribution facilities, and supplemental sources of supply. How does that overlay, though, with the general Texas concept? You know, it's been since, you know, Spanish water rights, which we can, you know, in Texas history, that they belong to the landowners. So if it's not specific, why should we assume that you're right? So remember that groundwater belongs to the landowners, surface water is owned by the state. Right. So we as a state entity are delegated the control and regulatory authority over the surface water of a specific river and its tributaries, and so we're given all of these rights to control that surface water. Right, but to equalize the price with the groundwater is not controlling the surface water. Well, remember, first of all, that's not a regulation, that was a contract, right? Right. So this is a groundwater reduction plan contract, where to incentivize participants to join our group, our groundwater reduction plan, we had to make it attractive for both surface water and groundwater users to participate. So the only way you get people to take the more expensive surface water is if they're not going to have to pay more for doing that than the groundwater users. So you're not claiming you had the authority to regulate the groundwater, they just chose to enter into a contract that bound them? Precisely. Lone Star Groundwater Conservation District has sole authority to regulate the groundwater. We... But you've never purported to have that authority. Correct. We don't regulate groundwater. We don't have that authority, that's not what river authorities do. And their argument that they have been displaced and regulated is premised on that you tried to, but you're saying you didn't because it was a free and open contract. You heard him explain and answer why the other people chose not to sign those contracts, which would suggest they weren't regulated. Right. Do you have a thought about that? Yes. So that's right. What they're doing, and this is sort of a slate of hand in the brief, and this area is a little confusing, but they are trying to attribute what Lone Star did with full authority to us, a river authority, that's not what... This was not our regulation that set this in place. Now they have tried to paint Lone Star and SJRA as conspiring together to put all of this in motion. And I would point the court to chapter 361071 of the Water Code. This entire chapter, 36, of the Water Code, governs groundwater conservation districts. This is what governs Lone Star. There is a provision in the Water Code that specifically mandates that groundwater conservation districts shall coordinate its management plan with the regional surface water management entity, which is SJRA. So they've sort of painted this fanciful conspiracy story when in fact the Water Code mandates that Lone Star coordinate with SJRA to come up with a collective plan to conserve and develop their respective spheres. One is groundwater, one is surface water. But that doesn't give equalized prices. Right. And think about it this way, Judge Elrod. Why would any surface water taker agree to participate in a contract where they have to pay more than the groundwater user when the groundwater user needs the surface water taker so that they can continue pumping groundwater? It's a symbiotic, synergistic relationship between groundwater and surface water. So if they're all under this mandate to reduce their groundwater usage, they all have to come up with a solution, they can do different things. Which now they aren't. But that's after the fact. Remember, this happened after we all entered into these contracts, after we built the surface water infrastructure and $500 million of bonds have been issued. And to that point, and I see my time's expired, may I briefly conclude with this point. Not only have these bonds been issued, but the Attorney General of the State of Texas has reviewed these contracts and approved these bonds, and by statute, in the Water Code and the Government Code, the sites are in our brief, once that process happens, these contracts are now made incontestable and valid, binding, and enforceable, that's also stated in last year's Texas Supreme Court case dealing with City of Conroe versus SJRA, such that Texas state antitrust laws can't touch these contracts. So why would a federal Sherman Act ever have any bearing on what state policy has already allowed us to do by statute through our enabling legislation, and then after the fact has been blessed by the state, and now made incontestable by statute? Thank you. We appreciate the arguments of counsel in this case. Thank you.